

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE DEC 10 2015

CHIEF JUSTICE

This opinion was filed for record
at 8:00 nm on Dec. 10, 2015

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of M.H.P., a minor child. | No. 90468-5 |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | En Banc |
| Petitioner, | Filed ____DEC 1 0 2015____ . |
| v. | |
| PAUL PARVIN and LESLIE BRAMLETT, | |
| Respondents. | |

WIGGINS, J.—The Department of Social and Health Services (Department) and Diana Farrow, the court appointed special advocate (CASA) for dependent minor M.H.P., appeal from an order of the King County Superior Court denying their motion to unseal several sets of motions and orders. The underlying documents at issue are motions filed by M.H.P.'s parents to obtain public funding for expert services in connection with proceedings to terminate their parental rights. The court granted the motions ex parte without holding a hearing or providing notice to the other parties or to the public. After the CASA discovered the disputed orders, the Department moved to unseal the disputed documents. The superior court denied the Department's motion and the Court of Appeals affirmed.

We hold that the superior court's ex parte sealing practice and the sealing of the disputed documents violate the court rules and Washington Constitution article I, section 10. Specifically, the indiscriminate ex parte sealing of documents pertaining to motions for public funding for expert services violates General Rule (GR) 15; the justifications advanced by the superior court do not warrant creating a blanket exemption from GR 15 in parental termination cases; and in its memorandum opinion explaining the disputed orders, the superior court did not apply (or even mention) the *Ishikawa*[1] factors that all courts must analyze before granting a motion to seal. For these reasons, we reverse and remand.

## BACKGROUND

M.H.P. is the son of Leslie Bramlett and Paul Parvin. He was less than two years old when these dependency proceedings commenced. M.H.P.'s parents experienced repeated episodes of mental illness, substance abuse, and incarceration in the years preceding and following M.H.P.'s birth. The dependency proceedings commenced after Bramlett, accompanied by M.H.P., arrived at an emergency room (ER) showing signs of paranoia and threatening the ER staff. M.H.P. was removed from his parents' care; he remained in the custody of the State until a guardianship order was entered more than two years later.[2] Two months after M.H.P. was removed from his parents' custody, the King County Superior Court found M.H.P. dependent

---

[1] *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982).
[2] During Supreme Court oral argument, the parents' attorney stated that the child has been in the custody of his maternal aunt during the dependency and guardianship proceedings.

through agreed orders with both parents. Later the same month, the Department commenced proceedings to terminate Bramlett's and Parvin's parental rights.

The superior court's case schedule included a deadline for the completion of discovery, including an exchange of witness lists. More than a month after that deadline passed and approximately six weeks before the original trial date, Bramlett filed an ex parte motion seeking public funds to retain expert services and a declaration from Bramlett's attorney supporting the motion. The motion was accompanied by an order granting the motion for public funding signed by the head of the King County Office of Public Defense (now the King County Department of Public Defense). Also accompanying the motion and order were an ex parte motion to seal and an ex parte motion for a protective order; a King County superior court judge signed orders granting both of those motions. M.H.P.'s parents filed two more such motions for expert services with accompanying motions to seal during the following two months. As before, the head of the King County Office of Public Defense signed orders granting the request for public funds and the judge signed orders sealing the motions, orders, and attached documents. The court granted and entered at least one more set of similar motions and orders after the trial court issued its opinion upholding this ex parte practice.

The declarations and other materials attached to the motions for expert funding included background information regarding the prospective experts and also some information regarding the types of evaluations and services the experts would perform. Two of the motions called for an expert to perform a "parenting" or "parent-

3

child" observation. The court never disclosed the existence, much less the content, of these motions or orders to the CASA, the State, or the public.

The CASA's counsel inadvertently discovered the orders when reviewing the legal file while preparing for trial. She discovered similar ex parte motions and orders in the files of several other parental termination cases. After discovering the sealed documents, the Department filed a motion to show cause as to why the sealing orders should not be vacated and the ex parte documents unsealed in each of the 11 cases in which the ex parte motions and orders had been discovered. The CASA filed a response supporting the Department's motion.

The judge who had signed all of the disputed sealing orders then issued a memorandum opinion denying the Department's motion and upholding the ex parte sealing practice. The opinion did not discuss the *Ishikawa* factors, which we have held courts must use before granting a motion to seal. Instead, the superior court justified this procedure by asserting that the ex parte procedure was necessary to protect the work product of indigent parents' attorneys. The trial court analogized parental termination cases to criminal cases, in which CrR 3.1(f) permits defendants to file ex parte motions for expert services. The court asserted that parents in termination cases have an "identical" need to protect their work product as do criminal defendants. After the judge denied the Department's motion for clarification, the petitioners appealed. The Department also filed notices of appeal in several other cases that were the subject of the trial court's opinion and order; according to the Department, those appeals have been stayed pending our decision in this case.

4

The trial date was continued several times at the request of one or both of the parents. After one such continuance, an agreed order withdrew the termination petition in favor of a guardianship petition. Less than two weeks before the trial date and more than eight months after the discovery deadline, Bramlett filed an amended witness list that included two previously undisclosed witnesses. One of those two witnesses—Dr. Carmela Washington-Harvey—had been the subject of two of the disputed ex parte sealing motions. The Department and the CASA moved to exclude those witnesses and the trial court granted that motion.

After trial, the court granted the guardianship petition and dismissed the dependency. That determination was the subject of a separate appeal by the parents, who challenged the trial court's exclusion of the two belatedly disclosed witnesses. *See In re Dependency of M.P.*, 185 Wn. App. 108, 111, 340 P.3d 908 (2014). After we granted review in the instant case, the Court of Appeals reversed the trial court's guardianship determination and remanded for a new trial, holding that the trial court failed to conduct an adequate analysis of the *Burnet*[3] factors before excluding the witnesses.[4]

The Court of Appeals, Division One, affirmed in an opinion by Chief Judge Spearman. *Dep't of Soc. & Health Servs. v. Parvin*, 181 Wn. App. 663, 682-83, 326

---

[3] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997). In *Burnet*, we held that the court must weigh three factors on the record in order to support a decision to exclude a witness: the willfulness of the violation, whether substantial prejudice arises from it, and the adequacy of lesser sanctions. *See id.* at 494.

[4] To the court's knowledge, the underlying guardianship case remains pending on remand; the ultimate disposition on the guardianship petition does not affect the outcome of the instant appeal.

P.3d 832 (2014). The majority held that applying GR 15(c) to indigent parents in termination proceedings would violate parents' due process rights. *Id.* at 666. The majority also held that even though the trial court never engaged in an *Ishikawa* analysis, the record demonstrated that the *Ishikawa* factors had been satisfied. *Id.* at 676-80. In a vigorous dissent, Judge Becker asserted that both the superior court and the Court of Appeals majority failed to consider the countervailing interests at stake. *Id.* at 687-88. She also criticized the majority for glossing over the possibility that redaction could have adequately protected the parents' rights. *Id.* at 684-86 (Becker, J., dissenting).[5]

## STANDARD OF REVIEW

We review a trial court's decision to seal records for an abuse of discretion. *Hundtofte v. Encarnacion*, 181 Wn.2d 1, 13, 330 P.3d 168 (2014). It is an abuse of discretion for a court to use an incorrect legal standard. *Id.* at 9. Determining the appropriate legal standard and assessing whether the trial court applied the correct legal standard are both issues of law that we review de novo. *Id.* at 13; *Rufer v. Abbott Labs.*, 154 Wn.2d 530, 540, 114 P.3d 1182 (2005). "[I]f the trial court rested its decision on an improper legal rule, the appropriate course of action is to remand to the trial

---

[5] After we granted review, the parents filed a motion to dismiss this case as moot, claiming that the King County Superior Court no longer uses the challenged practice. The Department and the CASA opposed the motion, asserting that the superior court continued to utilize a similar ex parte sealing practice, citing King County Superior Court Local Rule 15(c)(2)(C); the underlying guardianship action remained pending; and the issue of ex parte sealing practices was an issue capable of repetition but evading review. We denied the motion to dismiss.

judge to apply the correct rule." *Dreiling v. Jain*, 151 Wn.2d 900, 907, 93 P.3d 861 (2004).

We review both the interpretation and the application of court rules de novo. *State v. McEnroe*, 174 Wn.2d 795, 800, 279 P.3d 861 (2012); *Hundtofte*, 181 Wn.2d at 13. Thus, we review de novo whether the trial court's ex parte sealing practice can be reconciled with GR 15. The constitutionality of court rules is likewise a question of law subject to de novo review. *In re Det. of D.F.F.*, 172 Wn.2d 37, 41, 256 P.3d 357 (2011).

## ANALYSIS

The superior court's ex parte sealing practice and the sealing of the disputed documents at issue here violate both GR 15(c) and article I, section 10 of the Washington Constitution. GR 15(c) requires courts to provide notice to opposing parties, hold a hearing on the sealing motion, and consider the adequacy of redaction before sealing a document. The trial court's ex parte sealing of the disputed documents violated all three of these requirements. The sealing of the disputed documents also ran afoul of article I, section 10 because the trial court failed to apply the *Ishikawa* factors, which require a court considering a motion to seal to provide an opportunity to object, use the least restrictive means, consider competing interests, and adequately limit the breadth of the sealing order. None of the *Ishikawa* factors supports the trial court's decision to indiscriminately seal, rather than partially redact, all documents connected with the parents' request to obtain public funds.

Throughout this analysis, three separate types of documents are at issue: (1) the parents' *motions* to obtain public funds to retain experts, (2) the *orders granting or denying* those motions, which in this case appear to have been signed by the head of the KCOPD rather than by a superior court judge, and (3) the superior court's *orders sealing* those motions. Where appropriate, our analysis distinguishes among these three categories of documents.

## I. The trial court's sealing of the disputed documents without notice or a hearing violated GR 15

### A. Background on GR 15

GR 15 provides a "uniform procedure" for sealing or redacting court records. GR 15(a). The rule "applies to all court records, regardless of the physical form of the court record, the method of recording the court record, or the method of storage of the court record." *Id.* The General Rules define "court record" in equally broad terms, stating that a court record "includes, but is not limited to . . . [a]ny document, information, exhibit, or other thing that is maintained by a court in connection with a judicial proceeding." GR 31(c)(4); GR 15(b)(2). GR 15 thus covers motions filed in parental termination cases and orders granting or denying those motions.

If a party moves to seal a court record, GR 15(c) requires the court to hold a hearing; provide all parties with notice of that hearing; and, if it decides to grant the motion, issue written findings justifying the decision to seal:

> (1) In a civil case, the court or any party may request a hearing to seal or redact the court records. In a criminal case or juvenile proceeding, the court, any party, or any interested person may request a hearing to seal or redact the court records. Reasonable notice of a hearing to seal must be given to all parties in the case. . . . *No such notice*

*is required for motions to seal documents entered pursuant to CrR 3.1(f) or CrRLJ 3.1(f).*

> (2) After the hearing, the court may order the court files and records in the proceeding, or any part thereof, to be sealed or redacted if the court makes and enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record. . . .

GR 15(c) (emphasis added). Subsection (c)(3) bars courts from sealing records "when redaction will adequately resolve the issues before the court pursuant to subsection (2)."

GR 15(c)(1) provides that notice need not be given for motions to seal filed under two criminal rules that permit "[a] lawyer for a defendant who is financially unable to obtain investigative, expert or other services necessary to an adequate defense" to file an ex parte motion to obtain such services at public expense. CrR 3.1(f)(1)-(2); CrRLJ 3.1(f)(1)-(2). Those criminal rules permit the court to grant and seal the motion "upon a showing of good cause." CrR 3.1(f)(1)-(2); CrRLJ 3.1(f)(1)-(2). Neither GR 15 nor any other general, juvenile court, or civil rule includes any such exemption for indigent parents in parental termination cases.

*B. The trial court's sealing practice violates GR 15(c)*

Here, the trial court conducted the entire sealing procedure ex parte, which violates GR 15(c)(1)'s requirement that the court provide notice and a hearing to the opposing party before deciding whether to seal a court record. It also failed to comply with GR 15(c)(2) because it did not issue written findings justifying its decision to seal the disputed records at the time of sealing. If the CASA had not happened upon one of the court's sealing orders, neither the CASA, the State, the public, nor this court

would ever have known what documents the superior court had sealed and why it had sealed them. Consequently, the trial court's ex parte sealing practice and the sealing of the disputed documents violates GR 15(c)(1).

The superior court's memorandum opinion justifying the sealing practice, which it issued only after the Department became aware of the disputed documents and filed its motion to show cause, also did not comply with GR 15. The opinion made no factual findings regarding the specific motions filed by M.H.P.'s parents, as required by GR 15(c)(2). Instead, the opinion discussed general matters of policy regarding parents' privacy interests in termination cases. The memorandum opinion also did not set forth substantial and compelling reasons, as required by GR 15(c)(2), for *sealing* the documents at issue rather than simply redacting portions of them. Finally, and as discussed in greater detail below, redaction would have adequately addressed the concerns underlying the court's decision to seal. The indiscriminate sealing of the disputed documents thus violated GR 15(c)(3) as well. For these reasons, we hold that the superior court's sealing orders violated GR 15.

C. *CrR 3.1(f) does not apply in cases governed by the Superior Court Civil Rules*

Some of the superior court's sealing orders rely on CrR 3.1(f). But, as noted above, that rule applies only to criminal cases and the civil and juvenile court rules contain no parallel provisions. Curiously, the superior court and Court of Appeals both assert that the superior court could look to the criminal rules for guidance precisely *because* the civil and juvenile court rules include no provisions paralleling CrR 3.1(f) or CrRLJ 3.1(f). But the omission of a provision that appears in the criminal rules from

the civil and juvenile court rules can hardly be construed as an invitation for courts to read the provision into rules where it does not appear. GR 15(c) governs motions to seal in civil, criminal, and juvenile court cases alike. The rule explicitly exempts motions filed under CrR 3.1(f) from the usual notice requirements; it does not include any such exemption for any motions filed in civil or juvenile court cases. "Under expressio unius est exclusio alterius, a canon of statutory construction, to express one thing in a statute implies the exclusion of the other. Omissions are deemed to be exclusions." *In re Det. of Williams*, 147 Wn.2d 476, 491, 55 P.3d 597 (2002) (citation omitted). Because GR 15(c) expressly includes an exemption for criminal cases but not for civil or juvenile court cases (or rather, juvenile court cases not involving a juvenile offense),[6] local courts cannot use CrR 3.1 as a basis for disregarding the notice requirements of GR 15(c)(1) in parental termination cases.

D. *The work product doctrine does not supply a basis for disregarding GR 15*

The superior court and Court of Appeals also rely on the parents' interest in protecting their work product as a basis for failing to provide notice to the Department and the CASA. *See Parvin*, 181 Wn. App. at 673-74. The work-product doctrine is, to be sure, a well-established principle that protects important interests. But it is not, as the superior court and Court of Appeals appear to assume, a fundamental right with

---

[6] The result would likely be different if this were a juvenile offense case rather than a parental termination case, because the Superior Court *Criminal* Rules apply in juvenile offense cases unless they are "inconsistent with" the juvenile court rules and applicable statutes. JuCR 1.4(b). Thus, CrR 3.1(f) would apply in juvenile offense cases because no contrary rule appears in the juvenile court rules. By contrast, JuCR 1.4(a) makes the Superior Court *Civil* Rules applicable in parental termination cases in the absence of a contrary JuCR and, as explained *supra*, the civil rules contain no provisions paralleling CrR 3.1(f).

constitutional moorings. It is a qualified privilege that provides protection from discovery. The metes and bounds of the work-product doctrine are established by rules of civil and criminal procedure, and they do not supply a basis for disregarding other applicable rules—particularly rules such as GR 15 that protect other important interests.

The Supreme Court adopted the work-product doctrine in *Hickman v. Taylor*, which held that "'work product of the lawyer'" is exempt from discovery under the Federal Rules of Civil Procedure. 329 U.S. 495, 511, 67 S. Ct. 385, 91 L. Ed. 451 (1947). *Hickman* examines work product solely as a principle of discovery under the Federal Rules of Civil Procedure, not as a component of any constitutional right. *Hickman* does not mention due process, nor does it otherwise analyze the work-product doctrine as a constitutional principle. In the seven decades since *Hickman* was decided, neither the Supreme Court nor this court has ever held that work-product protection is a constitutional right. Instead, this court has promulgated rules of civil and criminal procedure to define the extent to which parties' trial preparation materials are exempt from discovery. *See* CR 26(b)(4)-(5); CRLJ 26(f) (incorporating CR 26 for civil cases in courts of limited jurisdiction); CrR 4.7(f)(1); CrRLJ 4.7(f)(1). It is to those court rules, and not our constitutional jurisprudence, that courts and parties must look to determine whether work-product protection applies, and court rules do not become

a matter of fundamental due process simply because a litigant's fundamental substantive rights are involved.[7]

### E. Applying GR 15 in parental termination cases does not abridge parents' due process rights

The Court of Appeals' opinion suggests that applying GR 15 in parental termination cases would violate parents' due process rights. We disagree. We determine whether a practice or procedure infringes on due process rights by using the three-part test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The three *Mathews* factors are the private interests at stake, the risk that the procedures used will lead to erroneous decisions, and the countervailing government interests supporting the challenged procedure (in this case, GR 15's notice requirements). *See In re Dependency of M.S.R.*, 174 Wn.2d 1, 14, 271 P.3d 234 (2012). In *Lassiter v. Department of Social Services,* the United States Supreme Court applied the *Mathews* test to parental termination cases and held that parents facing termination of their parental rights do not have a right to appointed counsel under the 14th Amendment's due process clause. 452 U.S. 18, 32-34, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *see also id.* at 26-27 ("[T]he Court's precedents speak with one voice about what 'fundamental fairness' has meant when the Court has considered the right to appointed counsel, and we thus draw from them

---

[7] If that were the case, one might reasonably argue that the child has a due process right to see GR 15(c) enforced. After all, a child's fundamental right to health and safety is at stake in parental termination proceedings, just as parents' fundamental right to the care and custody of their children is at stake. *E.g., In re Dependency of R.H.*, 129 Wn. App. 83, 88, 117 P.3d 1179 (2005).

the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his *physical* liberty." (emphasis added)).[8] In so holding, the Supreme Court overruled the federal constitutional component of our opinion in *In re Welfare of Luscier*, in which we held that indigent parents in termination proceedings have a due process right to counsel at public expense under both the state and federal constitutions. 84 Wn.2d 135, 139, 524 P.2d 906 (1974).

We need not revisit the state constitutional component of *Luscier* today because the claimed right at issue in this case is not the basic right to appointed counsel, which Washington parents receive under RCW 13.34.090(2), but rather indigent parents' ability to request public funding for expert services without complying with the notice requirements of GR 15. Applying the *Mathews* factors, we conclude that due process does not require discarding GR 15 when parents seek such funding. While the interests at stake are significant for parents in termination proceedings, GR 15 does not infringe those interests, and compelling interests support the enforcement of GR 15. Crucially, the Superior Court Civil Rules, which courts must also apply in termination cases, both protect parents' trial preparation and reduce to the vanishing point the risk of erroneous deprivation of parents' rights.

With respect to the first *Mathews* factor, parents have a fundamental liberty interest in the care and custody of their children. *E.g., In re Dependency of K.D.S.*, 176 Wn.2d 644, 652, 294 P.3d 695 (2013). Terminating parental rights is, therefore,

---

[8] The Court of Appeals' opinion glossed over *Lassiter*, simply noting in a footnote that *Lassiter* overruled the federal constitutional component of our prior holding in *In re Welfare of Luscier*, 84 Wn.2d 135, 139, 524 P.2d 906 (1974). *See Parvin*, 181 Wn. App. at 671 n.5.

"one of the severest of state actions." *In re Welfare of J.M.,* 130 Wn. App. 912, 921, 125 P.3d 245 (2005). Consequently, no one disputes that parents are entitled to due process in termination proceedings. But the right to due process does not mean a right to unlimited process, and determining the scope of process due requires balancing the parents' strong interests in termination proceedings against the final two *Mathews* factors. Here, both of those factors cut strongly against discarding GR 15 in termination cases.

As to the second *Mathews* factor, the risk of error, a complete examination of the relevant court rules demonstrates that GR 15 does not increase the risk that parents will have their rights erroneously terminated. While compliance with GR 15 discloses that an indigent parent is seeking funds to retain an expert, it would not meaningfully affect that parents' ability to defend against a termination claim because other court rules would, in any event, require disclosure of the reports of any experts who would appear during the trial itself while shielding work product. Under CR 26(b)(5)(A)(i), all parties must disclose upon request "each person whom the . . . party expects to call as an expert witness at trial" and the substance of their anticipated testimony.[9] Because such disclosure would be required regardless of whether a parent requires public funds to retain an expert, the notice required by GR 15 does not give the State the right to access any more information about indigent parents' testifying experts than all parties may receive under the civil discovery rules.

---

[9] The Court of Appeals apparently overlooked CR 26(b)(5)(B) when it incorrectly stated that "revelation of the names or expertise of potential experts would be prejudicial to parents because, once potential experts are identified, they are available for questioning by the State." *Parvin,* 181 Wn. App. at 673-74.

The civil rules also establish that an adverse party can discover materials relating to a *nontestifying* expert only under two circumstances: first, under CR 35(a)(1) and (b), where one party's experts perform a physical or mental examination on another party "or of a person in the custody or under the legal control of" another party. Thus, parents would have to provide the CASA with a report regarding any physical or mental examination conducted on the child by their experts and provide the report to the Department as well if the child is in the State's custody. Second, adverse parties may obtain nontestifying expert reports "upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." CR 26(b)(5)(B).[10] Outside these narrow exceptions, CR 26(b)(4) and (5) protect the work product of parents' attorneys and materials pertaining to parents' nontestifying experts; courts can redact documents containing such materials while leaving the remainder unsealed. CR 26(b)(5) and CR 35 thus effectively eliminate any prejudice that indigent parents might otherwise suffer as a result of complying with GR 15's notice requirements.

The Court of Appeals asserted that the operation of GR 15(c) "would likely chill defense use of experts" by encouraging parents to forgo consultation with nontestifying experts out of fear that the required notice would reveal portions of their

---

[10] In such a case, the party conducting the examination must provide the party or person being examined with a report of the examination's findings within 45 days of the examination and within 30 days before trial. *See* CR 35(b). Thus, if one of the parents' experts wished to examine M.H.P., the parents would have to provide the CASA with a copy of the resulting report. *See id.* The parents do not claim that CR 26(b)(5) or CR 35 infringes on their due process rights.

trial strategy to the State. *Parvin*, 181 Wn. App. at 674. But this too ignores the impact of CR 26(b)(5) and CR 35(b), which require disclosure of all testifying experts while protecting materials pertaining to nontestifying experts. As long as courts comply with those provisions of the Civil Rules, GR 15 should not deter indigent parents from consulting with experts, regardless of whether those experts ultimately testify at trial. Indeed, this "chilling effect" argument could just as easily be applied to experts who *are* called at trial because disclosing the substance of such experts' anticipated testimony provides the Department and the CASA with insight into how the parents intend to attack the Department's case for termination. Despite this, neither the parents nor the Court of Appeals suggests that CR 26 violates due process or that its expert disclosure requirements chill parents' use of testifying experts. The second *Mathews* factor thus weighs strongly in favor of applying GR 15 in parental termination cases.

The final *Mathews* factor—the countervailing interests that support the use of the challenged procedure—also weighs powerfully in favor of applying GR 15. The State has a compelling interest in protecting the welfare of children. *E.g.*, *In re Custody of Shields*, 157 Wn.2d 126, 144, 136 P.3d 117 (2006). Indeed, "we have ruled that a child's welfare is the court's primary consideration. Consequently, when the rights of parents and the welfare of their children are in conflict, the welfare of the minor children must prevail." *In re Welfare of Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973). It follows that the child has a strong interest in the speedy resolution of dependency and termination proceedings, *see* RCW 13.34.020, and the State has an interest in

17

ensuring such a speedy resolution to ensure that children do not remain in legal limbo—with the mental and emotional strain that entails—for any longer than is necessary.

These interests are undermined when a court seals documents relevant to the proceedings or decides motions on an ex parte basis. If an expert added through a sealed motion is later added to the witness list, the CASA and the State might be forced to request a continuance so that the State or the CASA can retain and prepare experts of their own. That possibility is not merely hypothetical. According to the CASA's superior court brief, in one of the other cases subject to the superior court's memorandum opinion, the parents disclosed an expert retained through an ex parte sealing order in a supplemental witness list submitted shortly before trial. The expert had not been mentioned on prior witness lists, but despite the prejudice this caused to the child, the CASA did not seek a continuance "because of the significant delays already in getting the case to trial . . . and the deteriorating mental health of the child due to the delays in the case."

The proper functioning of the adversary system depends on both parties having an opportunity to be heard when the court makes decisions related to a case. Failing to apprise all parties of pending motions can result in the court's making errors, as occurred in M.H.P.'s case. The judge who signed the sealing orders apparently was never made aware of the discovery deadlines and thus permitted the parents to retain a new expert after the discovery deadline had passed. Plainly, the speedy and fair

resolution of parental termination cases can be significantly undermined by the ex parte sealing procedure that the superior court utilized.

The State also has a strong interest in upholding the open administration of justice clause of Washington's constitution. WASH. CONST. art. I, § 10. As discussed further below, that interest would be significantly impaired if courts were permitted to discard GR 15 in parental termination cases.

Taking the factors as a whole, we conclude that applying GR 15's notice provisions in parental termination cases is, in concert with the other applicable court rules, fully consistent with protecting parents' due process rights.

### F. Applying GR 15 does not violate indigent parents' statutory right to effective legal representation

Finally, Bramlett and Parvin also claim that applying GR 15 in parental termination cases would interfere with indigent parents' *statutory* right to effective legal representation under RCW 10.101.005. *See Parvin*, 181 Wn. App. at 673-75. But the statutory right to effective representation does not supply indigent litigants with work-product protections beyond those set forth in the court rules, nor does it otherwise permit courts to grant exemptions from the General Rules and Civil Rules simply because compliance with those rules would place an indigent litigant at a disadvantage relative to some[11] litigants who can afford to retain their own counsel. The statute also does not provide a basis for disregarding the constitutional mandate

---

[11] We say "some" because dividing litigants into the binary categories of "indigent" and "wealthy" is a gross oversimplification. Undoubtedly, many litigants who do not meet the requirements for establishing actual indigency may nevertheless lack the financial resources necessary to retain experts whom they have no intention of calling at trial.

for the open administration of justice, which we discuss in greater detail below. We therefore reject the parents' argument on this point.

G. *Conclusion on GR 15*

In sum, the trial court erred in failing to adhere to GR 15's notice requirements. We reject the parents' argument that GR 15 can be disregarded in parental termination cases because it might lead to disclosure of the work product of the parents' attorneys and experts, both because work-product protection is not a constitutional right and because other court rules adequately protect parents' work product from disclosure. Other than interference with parents' work product, the parents, the superior court, and the Court of Appeals point to no basis on which applying GR 15's notice requirements implicate indigent parents' statutory right to effective legal representation or their constitutional right to due process. Because work-product protection does not supply a basis for indiscriminately sealing documents in violation of GR 15(c), we reject the parents' arguments on those points.

Courts may not grant exemptions from court rules simply because compliance with those rules would place an indigent litigant at a disadvantage relative to litigants who can afford to retain their own counsel and experts. This is particularly true where, as here, leveling the playing field would require abridging other vital interests such as the open administration of justice, monitoring the expenditure of public funds, and the speedy resolution of termination proceedings. For these reasons, the trial court should have applied GR 15 when assessing the motions to seal and its failure to do so was error.

20

II.  The trial court's sealing of the disputed documents violates article I, section 10

Even if it provides notice and a hearing and otherwise satisfies the requirements of GR 15, a court considering whether to seal a court record also must determine whether the sealing would violate Washington Constitution article I, section 10. To make this determination, a court must analyze the five factors set forth in *Ishikawa. See, e.g., Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 209-11, 848 P.2d 1258 (1993) (striking down a statute under article I, section 10 because the statute was not consistent with the *Ishikawa* factors). *Ishikawa* "requires a showing that is more specific, concrete, certain, and definite than" the "compelling privacy or safety concerns" required by GR 15(c)(2). *State v. Waldon*, 148 Wn. App. 952, 962-63, 202 P.3d 325 (2009). The five *Ishikawa* factors are:

> "1. The proponent of closure [and/]or sealing must make some showing of the need for doing so, and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
>
> "2. Anyone present when the closure [and/or sealing] motion is made must be given an opportunity to object to the closure.
>
> "3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
>
> "4. The court must weigh the competing interests of the proponent of closure and the public.
>
> "5. The order must be no broader in its application or duration than necessary to serve its purpose."

*Eikenberry*, 121 Wn.2d at 210-11 (citing *Ishikawa*, 97 Wn.2d at 36-39).[12]

---

[12] The five *Ishikawa* factors are essentially identical to the five factors of the test adopted in *State v. Bone-Club*, 128 Wn.2d 254, 261, 906 P.2d 325 (1995) to assess the propriety of sealing and closures in criminal cases.

Here, the superior court's memorandum opinion did not analyze the sealing requests using the *Ishikawa* factors; in fact, the opinion does not even mention *Ishikawa* or its progeny. For the reasons stated below, applying the *Ishikawa* factors to this case leads to the conclusion that the trial court should not have indiscriminately sealed all of the disputed documents, although the factors may permit limited redaction of documents that otherwise would be subject to work-product protection under our discovery rules. The court should have made sealing and redaction determinations on a document-by-document basis, rather than presumptively sealing all motions and orders regarding expert funding in parental termination cases.

A. *Need for sealing*

The first *Ishikawa* requirement is that the party seeking to seal a record "must make some showing of the need therefor." *Ishikawa*, 97 Wn.2d at 37. "Because courts are presumptively open, the burden of justification should rest on the parties seeking to infringe the public's right." *Id.* at 37-38. The party "should state the interests or rights which give rise to that need as specifically as possible without endangering those interests." *Id.* at 37. Where, as here, the interests at stake do not involve a criminal defendant's Sixth Amendment rights, the proponent of sealing must show a "'serious and imminent threat to some other important interest'" to demonstrate necessity. *Id.*

Here, this *Ishikawa* factor turns on whether the work-product doctrine suffices to establish a "need" for parents in parental termination cases to seal the motions and orders at issue. With respect to the court's orders—both the orders granting or denying the motions and the orders sealing the documents—the work-product doctrine

22

supplies no protection whatsoever. Work-product protection covers documents prepared by a party or a party's representative in anticipation of litigation. CR 26(b)(4). The purpose of the doctrine is to keep parties' trial preparation materials away from adversaries. *Limstrom v. Ladenburg*, 110 Wn. App. 133, 142, 39 P.3d 351 (2002). Plainly, court orders are not trial preparation materials and thus cannot be deemed work product. If a court wishes to ensure that its orders do not compromise a party's trial strategy, it should draft the orders so that they make no reference to information that might reveal that strategy. Regardless, the work-product doctrine does not establish the necessity of sealing the court orders.

As for the documents attached to the underlying motions for public funding, the parents can credibly assert a need to protect them from disclosure to opposing parties to the extent that they contain work product or other material protected by our court rules. The trial court's conclusory assertion that the documents contain work product does not satisfy *Ishikawa*, which requires a "specific, concrete, certain, and definite" showing of the need for sealing. *Waldon*, 148 Wn. App. at 962-63. To satisfy that requirement, the trial court could have redacted some portions of the disputed documents and, in the order explaining its decision to redact, could have stated that the redacted information consisted of opinions held by experts who are not expected to be called at trial, which are protected by CR 26(b)(5). Such an analysis could not, however, establish a need for the course of action that the trial court took in this case— indiscriminately sealing all documents submitted in connection with the parents'

23

motions. This factor thus weighs against the wholesale sealing of the disputed documents.

### B. *Opportunity to object*

The second *Ishikawa* factor requires that an opportunity to object to the suggested restriction be provided to anyone present when the sealing motion is made. *Ishikawa*, 97 Wn.2d at 38. "At a minimum, potential objectors should have sufficient information to be able to appreciate the damages which would result from free access to the proceeding and/or records." *Id.* The superior court provided no one with notice or an opportunity to be heard in this case because the court conducted the entire sealing procedure ex parte. As a result, neither the parties nor the public was able to learn about the basis for the trial court's sealing of the records. The second factor was not satisfied.[13]

### C. *Least restrictive means*

The third *Ishikawa* factor requires the court and the parties to "carefully analyze whether the requested method for curtailing access would be both the least restrictive means available and effective in protecting the interests threatened." *Id.* at 38. Where, as here, the endangered interests do not include a criminal defendant's rights under

---

[13] The Court of Appeals reasoned that this factor was satisfied because requiring notice "impinges on parents' constitutional rights to counsel and a fair trial" and because this factor addresses notice to the general public rather than to the parties. *Parvin*, 181 Wn. App. at 679. This reasoning fails. The parents' constitutional rights are relevant to the first and fourth *Ishikawa* factors, but they are a non sequitur under the second factor, which requires us to examine only whether the court provided an opportunity to object. And even if the third factor were addressed *only* to the public and not at all to the parties (and the Court of Appeals cites no authority stating that this is the case), then the trial court still failed to satisfy this factor because it provided *no one whatsoever* with an opportunity to object.

the Sixth Amendment to the federal constitution, the proponent of sealing bears the burden of demonstrating that no less restrictive means exist. *Id.* Here, all of the disputed orders and many portions of the other disputed documents did not constitute work product and thus could have been left unsealed without harming the parents' interests. But instead of redacting only those portions of the documents entitled to protection, the superior court indiscriminately sealed every word on every page of every motion and order pertaining to all of the parents' motions for expert services. This violates the third *Ishikawa* factor.

Consider the documents pertaining to the first motion to retain expert services filed by M.H.P.'s mother. The work-product doctrine is intended to protect the adversary process by ensuring that neither party pirates the trial preparation of another party. *Harris v. Drake*, 116 Wn. App. 261, 269, 65 P.3d 350 (2003). If the trial court were to conclude that redaction is necessary to protect the parents' trial preparation, the court could redact the identity, potential testimony, and the profession of the expert witnesses whom M.H.P.'s mother wished to retain but did not intend to call at trial. Work-product protection could also extend to those portions of the declaration of Bramlett's attorney that state the attorney's legal theories.[14]

But the work-product privilege would not protect the bare facts that M.H.P.'s mother was seeking public funding to obtain expert services and that her attorney filed a declaration supporting her motion for such funding—and that is the only information

---

[14] For example, the following statement on the second page of the declaration appears to be a statement of legal theory: "Dr. Solchany's report also does not accurately reflect the mother's current ability to parent because it does not account for Ms. Bramlett's engagement in Dr. Solchany's recommended services."

that an adversary might gain from reading most of the documents filed in connection with the first motion. The disclosure of this minimal amount of information regarding the underlying motions would not reveal anything of substance regarding the parents' trial strategy, and it certainly would not be tantamount to permitting the State or the CASA to pirate the trial preparation work of the parents' attorneys. Consequently, the court could have simply redacted the information on the pages that are entitled to protection under our court rules and left the remainder unsealed.

Both the superior court and the Court of Appeals state that protecting the parents' work product would necessitate redacting so much of the disputed documents that the notice provided would be rendered "'meaningless.'" *Parvin*, 181 Wn. App. at 673. This reasoning turns *Ishikawa* on its head. *Ishikawa* does not permit a court to assume that if a document contains some information that should be sealed, the rest of the document should presumptively be sealed as well. On the contrary, courts must start with the presumption that a court record should *not* be sealed and then seal or redact only what is necessary to protect the interests at stake. The court must unseal all material that remains after applying *Ishikawa*, regardless of court's impression of the meaningfulness of such disclosure.

For these reasons, the superior court's decision to seal the documents in question failed to satisfy the third *Ishikawa* factor.

D. *Weighing of competing interests*

Under the fourth *Ishikawa* factor, the parents' interest in protecting some aspects of their trial strategy from premature disclosure must be weighed against the

countervailing interests of the State, the child, and the public. Here, the countervailing interests include the child's interest in speedy resolution of termination proceedings, the public's interest in the open administration of justice, the Department's and the CASA's interests in expert services that involve the presence of the child, and the State's and the public's interests in the expenditure of public funds. The court's weighing of these countervailing interests "should be articulated in its findings and conclusions, which should be as specific as possible rather than conclusory." *Ishikawa*, 97 Wn.2d at 38. In this case, the trial court failed to adequately consider the countervailing interests when determining the necessity of sealing.[15] Those interests once again suggest that the documents in question should have been partially redacted rather than completely sealed.

The child has a strong interest in the speedy resolution of dependency and termination proceedings. RCW 13.34.020. As noted in the above discussion of due process, that interest is undermined when courts hear and decide motions on an ex parte basis. This weighs strongly against sealing the disputed documents.

Furthermore, our state's constitution firmly establishes that the public has a fundamental interest in the open administration of justice. WASH. CONST. art. I, § 10. That interest does not evaporate in parental termination cases. On the contrary, and as the amici brief of Allied Daily Newspapers and the Washington Coalition for Open

---

[15] The only countervailing interest that the superior court's opinion even mentions is the government's "budgetary interest in assuring that [expert] services are, indeed, necessary" when an indigent litigant files a motion for public funds. The superior court did not recognize that the public also has an interest in such expenditures, nor did it recognize the other countervailing interests discussed below.

Government states, the public has a strong interest in parental termination cases "to ensure that state laws are serving their intended purpose to nurture healthy families and protect children." Amicus Curiae Mem. at 1.

The public's interest is heightened yet further in this case because the motions in question called for the expenditure of public funds, which is of interest to both the State and the public. In the instant case, public funds were, in fact, wasted because the discovery deadline had already passed at the time the parents filed the motion for expert services. While that specific set of procedural facts obviously will be the exception rather than the rule when indigent parents seek public funds to hire experts, it nonetheless illustrates the errors that can occur in the adversary system when a court decides motions without providing all parties with notice and an opportunity to be heard.

Finally, two of the parents' motions requested that the court permit a potential expert to conduct a "parent-child observation" or "parenting observation." Assuming such observations involve the presence of the dependent child, the court should have considered the Department's and the CASA's interests regarding such observation sessions. Because M.H.P. was in the custody of the State throughout this period, those countervailing interests appear quite strong. This further weighs against the sealing of the disputed documents.

Each party in a parental termination case has important interests at stake, which makes compliance with *all* applicable court rules—including the rules regarding the sealing of documents—all the more vital. The superior court did not adequately

consider the important interests at stake for the State, the child, and the public. The fourth *Ishikawa* factor was not satisfied.

### E. Breadth of application

The final *Ishikawa* factor requires the court to make the closure or sealing order "no broader in its application or duration than necessary to serve its purpose." *Eikenberry*, 121 Wn.2d at 212. Here, the trial court violated the fifth *Ishikawa* factor by making a blanket decision regarding the sealing of documents in all parental termination cases rather than conducting an individualized analysis of the necessity and extent of sealing in each case. In our cases discussing the *Ishikawa* factors, we have repeatedly stated that its factors must be applied on a case-by-case basis. *E.g.*, *id.* at 211; *Dreiling*, 151 Wn.2d at 915.

In fact, our case law requires courts to specifically analyze the necessity of sealing *each individual document* at issue. *Eikenberry*, 121 Wn.2d at 208. Like the statute that we struck down in *Eikenberry*, the procedure endorsed and implemented by the superior court's memorandum order in this case does not direct judges to conduct an individualized analysis for each document in each case, but instead "ensure[s] no disclosure whatsoever" for all documents of a certain type. *Id.* at 212. This violates the *Ishikawa* framework, which requires that decisions to seal court records be made on an individualized basis. *Id.* at 211.

For the reasons stated above, the *Ishikawa* factors weigh against the ex parte sealing of the disputed documents. The sealing of those documents therefore violated article I, section 10.

## CONCLUSION

The sealing of the disputed documents violated both GR 15 and article I, section 10. We reaffirm that courts must conduct an individualized analysis of the *Ishikawa* factors when determining whether to seal or redact motions and orders such as those at dispute in this case. We therefore reverse and remand for further proceedings consistent with this opinion.

_____

WE CONCUR.

No. 90468-5


FAIRHURST, J. (concurring)—I agree with the majority that no blanket

exemption exists for the three categories of documents in this case, and the trial

judge needed to apply the *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640

P.2d 716 (1982) factors prior to sealing. I would reverse and remand for the trial

court to apply the *Ishikawa* factors.[1]


Fairhurst, J.

Madsen, C.J.

---

[1] The discussion in the majority and Justice Gordon McCloud's concurrence about application of the *Ishikawa* factors is unnecessary.

No. 90468-5

GORDON McCLOUD, J. (concurring in result)—The majority asserts that

"the justifications advanced by the superior court do not warrant creating a blanket

exemption from GR 15 [and *Ishikawa*[1]] in parental termination cases." Majority at

2. I agree. Under *Ishikawa, Press-Enterprise,*[2] *Globe Newspaper,*[3] *Eikenberry,*[4] and

their progeny, if the document or proceeding is one to which the right to an open

court or the open administration of justice, Washington Constitution article I, section

7 attaches, then a rule creating a blanket exemption from complying with those rights

is unconstitutional. I therefore concur in the result.

---

[1] *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982).

[2] *Press-Enter. v. Superior Court*, 478 U.S. 1, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986).

[3] *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982).

[4] *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 848 P.2d 1258 (1993).

But a right to courtroom closure or document sealing can still be advanced on a case-by-case basis. In fact, that is precisely the lesson of controlling cases like *Eikenberry* and *Globe Newspaper*. In both of those cases, the government passed a law barring automatic, or what the majority calls "indiscriminate," courtroom closure during certain specified situations: the *Eikenberry* case involved an article I, section 10 challenge to a statute completely barring automatic disclosure of the names and other identifying information of children who had suffered sexual abuse without any individualized determination as to the needs of the child for closure; and the *Globe Newspaper* case involved a First Amendment challenge to a state statute automatically barring press and public access to criminal trials of alleged sex offenders while minor victims testified. WASH. CONST. art. I, § 10; U.S. CONST. amend. I. In each case, each Supreme Court declared the statute unconstitutional for mandating automatic closure of presumptively open proceedings on a blanket basis, without individual inquiry. *See generally State v. Chen*, 178 Wn.2d 350, 356, 309 P.3d 410 (2013) ("In *Allied Daily Newspapers*, we held a statute unconstitutional that required courts to redact identifying information of child victims of sexual assault made public during the course of trial or contained in court records. Despite the important privacy interests of child victims of sexual assault, we recognized that the statute prevented the individualized assessment required under our interpretation

2

of article I, section 10. Similarly, we held a court rule unconstitutional that required involuntary commitment proceedings to be closed to the public. *In re Det. of D.F.F.*, 172 Wn.2d 37, 256 P.3d 357 (2011).").

Importantly, in both *Eikenberry* and *Globe Newspaper*, the court reasoned that there must be a forum in which an individualized determination could be made about courtroom closure, on a case-by-case basis. Neither the United States Supreme Court in *Globe Newspapers* nor our court in *Eikenberry* then proceeded on to say how that case-by-case determination would play out in every case.

I therefore disagree with the majority's decision to go on to evaluate whether the possible interests that the Superior Court order asserted, after the fact, as hindsight justifications for sealing might have sufficed if they been asserted by the proponent of sealing, prior to the decision on sealing, in a properly conducted *Ishikawa* hearing. That is not the role of this court. Instead, the established method for addressing the issue of whether asserted interests in closure outweigh the important constitutional right of the public and the press to open access to justice is for the trial court judge in each individual case to apply the *Ishikawa* balancing test.[5]

---

[5] I also disagree with the majority's assertion that the parents' attempt to keep matters related to their indigency and need for expert services private was the event that caused the judge to allow discovery deadlines to lapse. Majority at 18 ("The judge who signed the sealing orders apparently was never made aware of the discovery deadlines and thus permitted the parents to retain a new expert after the discovery deadline had passed.

Given that the majority has weighed in on these matters in dicta, though, I feel compelled to clarify that the outcome might not be exactly what the majority predicts in any future, individual, case.

The majority is certainly correct that in many cases, the right to an open courtroom will prevail over an asserted interest in sealing documents related to a civil litigant's need for certain expert services. Open access to court records and proceedings is fundamental to a functioning democracy. Open access "give[s] meaning to democratic aspirations that locate sovereignty in the people, constrain[s] government actors, and insist[s] on the equality of treatment under law." JUDITH RESNIK, BRING BACK BENTHAM: "OPEN COURTS," "TERROR TRIALS," AND PUBLIC SPHERE(S) 29 (2010), http://ssrn.com/abstract=1710640. The framers of Washington's constitution endorsed this value with the command: "Justice in all cases shall be administered openly." WASH CONST. art. I, § 10. We have interpreted this clause as more protective of the right to open court proceedings than the United States Constitution.

But backup documentation concerning an applicant's detailed financial records or the applicant's lawyer's time sheets, which might be submitted to

---

Plainly, the speedy and fair resolution of parental termination cases can be significantly undermined by the ex parte sealing procedure that the superior court utilized."). There is no proof of such cause and effect in the record.

establish indigency and/or a right to funding, are not necessarily even subject to the right of access. It depends on what documents are at issue. *Compare State v. Mendez*, 157 Wn. App. 565, 581-82, 238 P.3d 517 (2010) (sealed attorney billing record concerning defense of murder case were "court records" within the meaning of GR 15) *and United States v. Suarez*, 880 F.2d 626, 630-31 (2d Cir. 1989), *with United States v. Gonzales*, 150 F.3d 1246 (10th Cir. 1998) (no First Amendment right of access to backup documents supporting indigent criminal defendants' right to reimbursement for certain expenditures or detailed time sheets and related documents concerning appointed lawyers or investigators work), *and In re Boston Herald, Inc.*, 321 F.3d 174, 182-88 (1st Cir. 2003) (detailed examination "to determine if a constitutional right of access applies to particular documents such as [defendant's] indigency forms and the summary statement of the legal fees he owed for prior representation" and concluding that the answer is no), *and United States v. Lexin*, 434 F. Supp. 2d 836 (S.D. Cal. 2006) (defendants' financial information did not constitute judicial records subject to public disclosure).

If the documents or proceedings at issue are subject to the right to the open administration of justice, then the trial court would have to weigh the interests sought to be protected by sealing against the right to open access to justice—and, as discussed above, the trial court must do that in accordance with *Ishikawa*. Under

*Ishikawa*, and consistent with *Press-Enterprise*, the proponent of closure (in a civil case like this one) has the burden of showing a "'serious and imminent threat to [an] important interest'" to overcome the presumptive right of openness and access. *Ishikawa*, 97 Wn.2d at 37. The majority rejects the proponents' proposed interests in this case out of hand. But those proposed interests were never asserted in the context of an *Ishikawa* hearing, only as after-the-fact hindsight justifications that might have supported sealing had they been addressed and weighed by the judge prior to sealing.

If the proponent had to assert a right to sealing at a proper *Ishikawa* hearing, he might have asserted a fundamental right to privacy in data concerning his or her, or the family's, financial status. "Personal financial information, such as one's income or bank account balance, is universally presumed to be private, not public." *Boston Herald*, 321 F.3d at 190 (citing *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995); *see State v. Miles*, 160 Wn.2d 236, 156 P.3d 864 (2007). Our state constitution's article I, section 7 commands, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Article I, section 7, provides more protection of individual rights than the Fourth Amendment to the United States Constitution. *State v. Williams*, 171 Wn.2d 474, 484, 251 P.3d 877 (2011) (citing *State v. Morse*, 156 Wn.2d 1, 9-10, 153 P.3d 832 (2005)). If the

proponent of closure were to argue that the documents involved disclosed such data, then the trial court judge would have a difficult question to resolve about whether that constitutional privacy right outweighed the constitutional right of access in that particular case.

Similarly, if there had been an *Ishikawa* hearing, the proponent of sealing might have asserted that the constitutional right to a fair trial would be compromised by certain disclosures that a nonindigent litigant would not have to make. We explained in *Ishikawa* that, where the criminal defendant's right to a fair trial right is balanced against the right of open access, a proponent of closure need show only a "'likelihood of jeopardy'" to the fair trial right. *Ishikawa*, 97 Wn.2d at 37 (quoting *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 62, 593 P.2d 1330 (1980) and citing *Gannett Co. v. DePasquale*, 443 U.S. 368, 400, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979) (Powell, J., concurring))). Where the proponent of closure in a civil case like this one asserts that closure is necessary to support a right to a fair trial, then that proponent of sealing must show "'a serious and imminent threat'" to that right. *Id.* If the proponent tried to show that at an *Ishikawa* hearing, then once again the trial court would have a difficult decision to make based on the facts of the particular case.

Likewise, if the proponent had argued in favor of sealing at an *Ishikawa* hearing, he might have asserted the state constitutional right of access to the courts—a right enjoyed equally by all citizens, irrespective of financial status. *See Schroeder v. Weighall,* 179 Wn.2d 566, 577-78, 316 P.3d 482 (2014) (statute triggers heightened scrutiny under state equal protection clause where it burdens "both 'an important right and a semi-suspect class not accountable for its status'" (internal quotation marks omitted) (quoting *State v. Hirschfelder*, 170 Wn.2d 536, 550, 242 P.3d 876 (2010)).

I provide this list only to underscore the fact that the bulk of the majority's opinion is dicta. I join the majority's conclusion that the records at issue in this case were subject to the constitutional mandate that "justice in all cases be administered openly." Not all records concerning a litigant's indigency, however, will fall into this category. When they do fall into this category, they cannot be sealed without an individualized inquiry pursuant to *Ishikawa*. At a properly conducted *Ishikawa* hearing, the trial court judge must decide whether the interests asserted by the proponent of closure outweigh the public's constitutional right to know what is going on in our courts. The trial judge must answer those difficult questions on a case-by-case basis. This court should not be answering them in advance, for every case that might arise, or for every asserted interest in closure that might arise.

I therefore respectfully concur in the result.

_____