# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>C.G.S. and W.W.S.,<br><br>               Minor children. | DIVISION ONE<br><br>No. 83027-9-I<br>(consolidated with No. 83028-7-I)<br><br>ORDER GRANTING MOTION<br>FOR RECONSIDERATION,<br>WITHDRAWING OPINION, AND<br>SUBSTITUTING OPINION |

The appellant, M.S., has filed a motion for reconsideration of the opinion filed on October 17, 2022. The Department of Children, Youth, and Families has filed a response. The court has determined that said motion should be granted and that the opinion filed on October 17, 2022 shall be withdrawn and a substitute unpublished opinion be filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted; it is further

ORDERED that the opinion filed on October 17, 2022, is withdrawn and a substitute unpublished opinion shall be filed.

_____
Dwyer, J.

_____   _____
Birk, J.              Mann, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of:

C.G.S. and W.W.S.,

Minor children.

DIVISION ONE

No. 83027-9-I
(consolidated with No. 83028-7-I)

UNPUBLISHED OPINION

DWYER, J. — M.S. appeals from the juvenile court's order terminating her parental rights to her children, C.G.S. and W.W.S. She asserts that the order must be reversed because (1) the juvenile court permitted witnesses to testify at the termination hearing via videoconferencing, (2) the termination petition was not signed by an attorney, (3) all court-ordered services were not expressly and understandably offered or provided, (4) the juvenile court judge referenced M.S.'s behavior during the hearing in making credibility findings, and (5) the court-appointed special advocate (CASA) for C.G.S. testified regarding the child's preference of living situation. M.S. was not, however, denied due process during the termination hearing, and substantial evidence supports the trial court's finding regarding the provision of court-ordered services. Because M.S.'s other contentions are similarly unavailing, we affirm the trial court's order terminating her parental rights to C.G.S. and W.W.S.

I

M.S. is the mother of C.G.S. and W.W.S. She experienced significant trauma during her childhood and within an abusive marriage as an adult. She has been diagnosed with posttraumatic stress disorder and delusional disorder. The family has a long history of involvement with the Department of Children, Youth, and Families (the Department), stemming from numerous allegations of negligent treatment or maltreatment of the children, extensive drug use by both parents, and domestic violence with a firearm that the children were alleged to have witnessed. In January 2017, the Department filed a dependency petition regarding W.W.S. The dependency was dismissed in June 2017 without a dependency finding as to M.S. due to her completion of services.

In August 2018, the Department filed dependency petitions for C.G.S. and W.W.S. as to both parents,[1] alleging that "[t]he family has an escalating history of concerning behavior that seriously endangers the children's health, wellbeing, and safety." Both children were thereafter placed into shelter care.[2] Following a fact-finding hearing, an order of dependency was entered on March 28, 2019.[3] The dispositional order set forth services in which M.S. was required to engage. Alleging that she had "not made significant progress towards correcting the problems that necessitated the removal of the children," the Department filed a petition for the termination of M.S.'s parental rights on February 28, 2020.

---

[1] An order of dependency by default was entered as to the children's other parent, B.S., in December 2018. An order of default and an order terminating B.S.'s parental rights to C.G.S. and W.W.S. were entered on August 5, 2020. B.S. is not a party in this appeal.

[2] Neither child has been in his parents' custody since 2018.

[3] M.S. appealed from this order. In an opinion filed on August 24, 2020, we reversed the juvenile court's imposition of a urinalysis requirement but otherwise affirmed the juvenile court's decision. In re Dependency of W.W.S., 14 Wn. App. 2d 342, 469 P.3d 1190 (2020).

The juvenile court held a seven-day fact-finding hearing in June 2021. Following the hearing, the court found that M.S. "is currently unfit to parent" C.G.S. and W.W.S. The court found that M.S. "will not be able to remedy her parental deficiencies within the near future," and that C.G.S. and W.W.S. "have a right to a safe, stable, and permanent home and to a speedy resolution of this termination proceeding." Accordingly, the juvenile court found that termination of parental rights is in the best interests of both children. Thus, the court granted the Department's petition for termination.[4]

## II

M.S. first asserts that her due process rights were violated when the juvenile court, consistent with the COVID-19-related emergency court orders then in effect, permitted witnesses to testify at the termination hearing via videoconferencing. We disagree. M.S. was afforded a meaningful opportunity to be heard, including by viewing the witnesses' testimony from the courtroom, consulting with her attorney, and testifying herself in person and in the presence of her attorney. Accordingly, the procedures implemented by the juvenile court comported with due process requirements.

M.S. further asserts that she was denied the constitutional right of confrontation during the termination proceeding. Because such a right applies only in criminal prosecutions, we also reject this contention.

---

[4] Additional facts are set forth as necessary below.

3

A

"A parent's procedural due process rights protect their 'fundamental liberty interest in the care and custody of their children.'" In re Dependency of J.D.E.C., 18 Wn. App. 2d 414, 418, 491 P.3d 224 (2021) (quoting In re Welfare of M.B., 195 Wn.2d 859, 867, 467 P.3d 969 (2020)). Thus, when the State seeks to terminate the parent-child relationship, "'it must provide the parents with fundamentally fair procedures.'" M.B., 195 Wn.2d at 867 (quoting Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion)). In the context of a termination proceeding, due process requires "a strict burden of proof, the right to notice and an opportunity to be heard and defend, and the right to the assistance of counsel." M.B., 195 Wn.2d at 867.

Alleged due process violations are reviewed de novo. J.D.E.C., 18 Wn. App. 2d at 418. To determine whether court procedures comport with due process, we apply the balancing test set forth in Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). In re Dependency of G.L.L., 20 Wn. App. 2d 425, 429, 499 P.3d 984 (2021). "This test balances (1) the private interests affected, (2) the State's interest in using the challenged procedures, and (3) the risk of erroneous deprivation due to the procedures used." G.L.L., 20 Wn. App. 2d at 429.

We recently held that a mother's due process rights were not violated when a termination proceeding was held via videoconferencing due to COVID-19-related restrictions at the court. G.L.L., 20 Wn. App. 2d at 427-28.[5] There, as

---

[5] The juvenile court in that case "neglected to expressly conduct the Mathews balancing test on the record." G.L.L., 20 Wn. App. 2d at 429-30. We advised that "[a]s trial courts continue

4

here, the mother "was physically present in the courtroom alongside her attorney," while the other witnesses in the fact-finding hearing testified via videoconferencing. G.L.L., 20 Wn. App. 2d at 428-29. We noted that, there, the mother "was able to view each witness' testimony from the courtroom," "was in person for the entirety of the fact-finding hearing," and "was able to consult with her attorney in person." G.L.L., 20 Wn. App. 2d at 430. The same trial court procedures were implemented here.

In contrast, our Supreme Court has held that an incarcerated father's due process rights were violated when his participation was limited to appearing by phone for only a small portion of a termination proceeding. M.B., 195 Wn.2d at 869. As a result of this limited appearance, the father was unable "to testify in person and communicate with the court in the same manner as the State's witnesses" and "was unable to meaningfully review and challenge the State's evidence." M.B., 195 Wn.2d at 869. His absence from trial "deprived him of the opportunity to hear the vast majority of the State's evidence and assist his attorney in responding." M.B., 195 Wn.2d at 872.

M.S. undoubtedly has a fundamental interest in the care and custody of her children. J.D.E.C., 18 Wn. App. 2d at 418. "Because of the tremendous stakes, '[a] parent's interest in the accuracy and justice of the decision' is 'commanding.'" M.B., 195 Wn.2d at 868 (alteration in original) (internal quotation marks omitted) (quoting Santosky, 455 U.S. at 759). On the other hand, the

---

to hold proceedings virtually, judges should conduct the Mathews analysis on the record to ensure the proceeding comports with due process and to provide a sufficient record on appeal." G.L.L., 20 Wn. App. 2d at 430. The trial court did so here.

State has an interest in complying with the emergency orders issued by our Supreme Court and the King County Superior Court setting forth procedures to ensure the safety of court personnel, the parties and witnesses in a proceeding, and the public.[6] These orders remained in effect at the time of the fact-finding hearing. *Fifth Revised and Extended Order Regarding Courtroom Operations*, Order No. 257700-B-658, issued February 19, 2021;[7] King County Emergency Order No. 24, filed December 22, 2020.[8] Additionally, the State has an interest in the "speedy resolution" of termination proceedings "to ensure that children do not remain in legal limbo—with the mental and emotional strain that entails—for any longer than necessary." In re Dependency of M.H.P., 184 Wn.2d 741, 762, 364 P.3d 94 (2015).

M.S. does not assert that the juvenile court procedures implemented here denied her an opportunity to be heard or to receive the assistance of counsel. As in G.L.L., 20 Wn. App. 2d at 429, both M.S. and her attorney were present in-person during the termination hearing. M.S. was able to view the witnesses' testimony from the courtroom and consult with her attorney. See M.B., 195 Wn.2d at 874 ("a meaningful opportunity to be heard in a parental termination

---

[6] On appeal, M.S. contends that due process required the juvenile court to determine individually with regard to each witness whether that witness was at particular risk for severe COVID-19 infection. This assertion disregards that it is not simply the witnesses who have an interest in their own health and safety. In addition, the State has an interest in protecting court employees and the public in general. Moreover, we note that the juvenile court judge offered to consider the witnesses individually in determining whether to permit remote testimony. M.S.'s trial counsel declined.

[7] This and other orders addressing courtroom operations during the COVID-19 public health emergency are available at https://www.courts.wa.gov/opinions/index.cfm?fa=opinions.scorders (last accessed Sept. 29, 2022).

[8] King County emergency orders are available at https://kingcounty.gov/courts/superior-court.aspx (last accessed Sept. 29, 2022).

case includes the opportunity to hear the State's evidence and consult with counsel"). Here, the court procedures did not create a risk of erroneous termination of M.S.'s parental rights and the State's public health safety interest in permitting remote witness testimony was not outweighed by any such risk. Accordingly, pursuant to the factors set forth in Mathews v. Eldridge, 424 U.S. 319, the juvenile court correctly ruled that M.S.'s right to due process was not violated by the procedures implemented.

B

M.S. additionally contends that due process in termination proceedings includes the right to confrontation. Washington courts have consistently rejected this assertion. Parents' liberty interest in the care and custody of their children arises from the due process requirements of the Fourteenth Amendment and article I, section 3 of our state constitution. In re Welfare of Luscier, 84 Wn.2d 135, 139, 524 P.2d 906 (1974). "The confrontation clause of the sixth amendment to the United States Constitution applies to criminal prosecutions. A termination proceeding is a civil proceeding. Sixth Amendment rights do not extend to parents in a child termination proceeding." In re Welfare of S.E., 63 Wn. App. 244, 249, 820 P.2d 47 (1991); see also In re Dependency of Penelope B., 104 Wn.2d 643, 650, 709 P.2d 1185 (1985) (recognizing that the confrontation clauses of the federal and state constitutions do not apply in dependency proceedings, "since by their terms they . . . apply only in criminal cases"). Thus, M.S.'s assertion that civil due process protections encompass the right to confrontation is without merit.

M.S. was not denied due process by the procedures implemented in the juvenile court. Accordingly, we reject her contention that reversal of the termination order is required on this basis.

III

M.S. next contends that the termination petition was invalid because it was signed solely by Department social worker Kirsten Bolduan and, thus, not by an attorney. Because M.S. did not seek relief in the juvenile court on this basis, she may bring this challenge on appeal only if the purported error is both manifest and constitutional. She fails to establish either. A trial court may not strike an unsigned pleading unless the offending party has been afforded a reasonable amount of time to cure the defect once it is brought to that party's attention. Because the purported defect was not brought to the attention of the Department, the juvenile court was without authority to determine the sufficiency of the petition in this regard. Accordingly, the purported error is not manifest in the record and M.S. may not raise this claim of error for the first time on appeal.

Only in special circumstances will an appellate court review a claim of error that was not raised in the trial court. RAP 2.5(a); State v. O'Hara, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009). A party may raise for the first time on appeal a "manifest error affecting a constitutional right." RAP 2.5(a)(3). The appellant must demonstrate both that the error is "manifest" and that it "is truly of constitutional dimension." O'Hara, 167 Wn.2d at 98.

> "'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice."
> To demonstrate actual prejudice, there must be a "'plausible
> showing by the [appellant] that the asserted error had practical and
> identifiable consequences in the trial of the case.'" In determining

whether the error was identifiable, the trial record must be sufficient to determine the merits of the claim. "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest."

O'Hara, 167 Wn.2d at 99 (alteration in original) (quoting State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

Civil Rule 11 requires that "[e]very pleading, motion, and legal memorandum of a party represented by an attorney shall be dated and signed by at least one attorney of record." When a party is represented by an attorney, a pleading not signed by the attorney is treated as "unsigned" pursuant to this rule. See Biomed Comm, Inc. v. State Dep't of Health, Bd. of Pharmacy, 146 Wn. App. 929, 938, 193 P.3d 1093 (2008). The trial court may not grant relief premised on an unsigned pleading unless the transgressing party has been first afforded the opportunity to cure the defect. The rule is explicit: "If a pleading, motion, or legal memorandum is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant." CR 11(a)(4).

Here, the Department "through the undersigned caseworker" petitioned the juvenile court for an order terminating the parent-child relationship between M.S. and her children, C.G.S. and W.W.S. The petition was signed by Bolduan, "DCYF Social Worker."[9] M.S. asserts that the termination petition was "unlawfully signed" and that, as a result, the termination order is invalid. However, CR 11(a)(4) required that M.S. call the purported irregularity to the

---

[9] By declaration, the assistant attorney general explained the procedure undergone in filing the termination petition at issue. The Attorney General's Office (AGO) drafted the termination petition and sent it to social worker Bolduan for review. After completing any necessary edits, the AGO sent the finished petition to Bolduan for her signature. She thereafter sent the signed copy of the petition back to the AGO, and the AGO filed the petition.

attention of the Department, which would then have had the opportunity to cure any such defect.  M.S. did not do so.  Only after the Department was afforded this opportunity would the juvenile court have been called on to strike any unsigned petition.  CR 11(a)(4); see In re Welfare of M.T., 69 Wn. App. 380, 381-82, 848 P.2d 1302 (1993) (on motion to strike termination petitions that were signed only by a social worker, and not by an attorney, the trial court ruled that the petitions would be stricken unless signed by an attorney and refiled within 24 hours).

An error is manifest only if it "'had practical and identifiable consequences in the trial of the case.'"  O'Hara, 167 Wn.2d at 99 (internal quotation marks omitted) (quoting Kirkman, 159 Wn.2d at 935).  "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error."  O'Hara, 167 Wn.2d at 100.  Here, the juvenile court could have addressed the purported error only after M.S. first gave the Department the opportunity to cure any defect.  See CR 11(a)(4).  Because M.S. did not do so, the asserted error is not manifest.  Accordingly, M.S. may not raise the issue for the first time on appeal.[10]

---

[10] We note that, in addition to not being manifest, the asserted error, which is premised on a court rule, is also not of constitutional magnitude.  In attempting to establish a manifest constitutional error, M.S. nevertheless contends that separation of powers principles are implicated.  However, Division Two of this court, in a decision we regard as well-reasoned, has held that the separation of powers doctrine is not violated where a nonattorney is authorized by statute to petition the court.  In re Treatment of L.G., 78 Wn. App. 420, 425-26, 897 P.2d 1275 (1995) (statute permitting nonattorney to sign petition for an order of commitment for alcoholism did not violate separation of powers doctrine by presuming to authorize the practice of law by nonattorneys); see also M.T., 69 Wn. App. at 383-84 (dependency petitions, signed only by a social worker, were valid where statute and court rule authorized nonattorneys to file such petitions).  As relevant here, RCW 13.34.180(1) provides that "[a] petition seeking termination of a

IV

M.S. additionally challenges the juvenile court's finding that all court-ordered services were expressly and understandably offered or provided. Specifically, she asserts that the court-ordered service of dialectical behavioral therapy (DBT) was not offered or provided because, according to M.S., she was "belatedly" informed about DBT programs and was not offered a program that complied with service provider recommendations. The record, however, demonstrates that social worker Bolduan timely and repeatedly provided M.S. with information regarding DBT services, but that M.S. did not attempt to access those services. Indeed, the record shows that M.S. disagreed with the court-ordered service and believed that it was unnecessary. Because substantial evidence supports the juvenile court's finding, M.S.'s contention is unavailing.

In reviewing a trial court's decision to terminate parental rights, we are "limited to assessing whether substantial evidence supports the trial court's findings." In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016) (quoting In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer "to the trial court's weighing of the evidence and witness credibility determinations." D.H., 195 Wn.2d at 718. The trial court's findings "'will not be disturbed unless clear,

---

parent and child relationship may be filed in juvenile court by any party to the dependency proceedings concerning that child." Accordingly, M.S.'s claim or error does not raise a constitutional error, does not raise a manifest error, and indeed establishes no error at all.

cogent, and convincing evidence does not exist in the record.'" K.M.M., 186 Wn.2d at 477 (quoting In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995)).

Parental rights may be terminated only when the Department has established by "clear, cogent, and convincing evidence" the six elements set forth in RCW 13.34.180(1).[11] D.H., 195 Wn.2d at 718. As relevant here, the Department must show "[t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided." RCW 13.34.180(d). Allegations are proved by clear, cogent, and convincing evidence when "the ultimate facts are shown to be 'highly probable.'" K.M.M., 186 Wn.2d at 478 (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

Here, the dependency order required that M.S. engage in random weekly urinalysis for 90 days, a psychological evaluation with "follow through with any treatment recommendations," and a parenting assessment with "follow through with any treatment recommendations." The Department referred M.S. to Dr. Steve Tutty, licensed clinical psychologist, in July 2019. Following the psychological evaluation, Dr. Tutty recommended that M.S. meet with a

---

[11] The six termination factors are:
    (a) That the child has been found to be a dependent child;
    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
    (d) That the services offered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.
RCW 13.34.180(1).

medication provider to explore psychotropic medication, "complete a one-year [DBT] program," and complete a parenting class called "The Incredible Years."

In the subsequent months, M.S. engaged in evaluations with two additional service providers. Following a parenting evaluation of M.S., Dr. Carmela Washington-Harvey reviewed Dr. Tutty's report and agreed with his recommendations. She noted "denial as a major defense mechanism" for M.S. She hoped that engagement in the services recommended by Dr. Tutty would help M.S. to "understand the value of these services for her." Dr. Washington-Harvey felt that M.S.'s prognosis was "guarded." She recommended that M.S. "[f]ollow [the] recommendations in Dr. Tutty's evaluation unless doing otherwise is justified in writing by qualified professionals that are informed by Dr. Tutty's evaluation." Dr. JoAnne Solchany, psychiatric nurse practitioner, also evaluated M.S. She agreed with Dr. Tutty's recommendations, including that M.S. "participate in a yearlong DBT program."

Social worker Bolduan began making efforts to locate appropriate DBT providers when she received Dr. Tutty's evaluation in 2019. Bolduan continued her efforts throughout the following year-and-a-half. During this time, she researched the entire behavioral health provider list from King County's website, calling every agency that would accept Apple Health or Medicaid. She "called repeatedly throughout 2020" to locate a DBT program for M.S. By February 2020, social worker Bolduan had referred M.S. for DBT services to Harborview, Sound Mental Health, and Valley Cities.[12]

---

[12] The record demonstrates that social worker Bolduan referred M.S. to Harborview, including for DBT services, before or during February 2020. The same case note referenced at

The service letters in the record further demonstrate Bolduan's continued efforts to refer M.S. to a DBT program. For instance, in April 2020, Bolduan sent a service letter to M.S., detailing the court-ordered services that M.S. had completed and providing referrals for services in which she had not engaged. With regard to DBT, Bolduan provided the names, locations, and contact information for the Sound Mental Health and Valley Cities providers that she had identified. She informed M.S. that "Valley Cities, Meridian, does not have a waitlist and they have several providers on staff who provide DBT." Bolduan received no indication from M.S. that she had attempted to contact DBT service providers or had engaged in this service.

Social worker Bolduan sent another service letter to M.S. in August 2020. She again included the contact information for Sound Mental Health and Valley Cities, and again informed M.S. that Valley Cities did not have a waitlist and had several providers that offered the court-ordered service. She additionally provided contact information for Harborview, which, she informed M.S., "also offers DBT therapy." Bolduan attached a release of information (ROI) form, explaining to M.S. that it was necessary for the Department to verify that she was engaged in DBT. The letter further reminded M.S. that "[a]gain, last time I called agencies regarding DBT, Sound and Valley Cities did not have waitlists."

In October 2020, M.S. sent to social worker Bolduan a lengthy and hostile e-mail, accusing Bolduan of "violation of the law" in various respects, including by

---

the termination hearing further indicates that M.S. was additionally referred to both Sound and Valley Cities by this time. Bolduan's testimony, which was found credible by the juvenile court, thus supports the court's finding that DBT was being offered to M.S. "in or around late 2019."

14

"push[ing] therapy and medications that have had a devastating effect on [her] children's well-being" and making "incorrect and liable and slanderous" statements.  M.S. claimed that Dr. Tutty's report, which was based on his psychological evaluation of M.S., "was riddled with incorrect information that [Bolduan] provided which lead to invalid recommendations."  She indicated that DBT was "deemed not appropriate by Harborview" and that she had "even paid for DBT therapy and took the course gaining some benefit of some of the methods."  Social worker Bolduan attempted to explain to M.S. "several times" that she had been sent to Harborview for a different service, but Bolduan was met with only argumentative responses.

Later that month, M.S.'s attorney e-mailed Bolduan, asking whether there was "[a]ny reason to believe" that the DBT providers identified in the August 2020 service letter did not currently have openings.  Bolduan replied to both the attorney and M.S. that she had spoken to Valley Cities the previous day, and that "the Meridian location is doing DBT groups via telehealth."  She again provided the contact number.

In March 2021, social worker Bolduan sent to M.S. "the most recent service letter."  Because she had not yet received from M.S. an ROI form regarding engagement in DBT, Bolduan attached another such form to the service letter.  She asked M.S. to "[p]lease let me know if you need assistance filling it out."  Bolduan again provided the contact information and locations for Sound Mental Health and the Meridian location of Valley Cities.

15

In May 2021, Bolduan again provided to M.S. "the most recent service letter." She wrote: "Please let me know if there is a barrier to your completing your court-ordered services and we may be able to problem-solve them together." Because she had not received any indication that M.S. was engaging in DBT, Bolduan again included contact and location information for the DBT programs that she had identified. M.S. replied with yet another lengthy and hostile e-mail in which she again asserted various purported wrongdoings of the social worker. She claimed to have done a "side study of the DBT" and to be "working with the Internet provider" to provide that information to Bolduan. There is no indication in the record that M.S. ever provided such information.

Following the termination fact-finding hearing, the juvenile court found that the service providers, including social worker Bolduan, Dr. Tutty, Dr. Solchany, and Dr. Washington-Harvey, were credible and provided credible testimony. The court found M.S.'s testimony to be not credible, based on its inconsistency with the testimony of other witnesses. Based on the service letters admitted into evidence and the testimony of social worker Bolduan, the court found that the "[s]ervices ordered under RCW 13.34.130 have been expressly and understandably offered or provided to the mother."

M.S. asserts, however, that the Department failed to expressly and understandably offer or provide the court-ordered service of DBT because, according to M.S., it informed her of the DBT programs "belatedly" and "did not help her when she encountered problems trying to access DBT."[13] The record

---

[13] Br. of Appellant at 45-46.

does not support this contention. Rather, social worker Bolduan's testimony establishes that she began making efforts to locate DBT providers when she received Dr. Tutty's evaluation and that she "called repeatedly throughout 2020" to locate an appropriate program.[14] Referencing a case note from February 2020, Bolduan testified that she had, by that time, referred M.S. for DBT services to Harborview, Sound Mental Health, and Valley Cities. This evidence refutes M.S.'s contention that DBT referrals were provided to her "belatedly."

Moreover, the service letters in the record—sent in April 2020, August 2020, March 2021, and May 2021—show that social worker Bolduan provided contact and location information for service providers that she had identified as providing DBT. She provided not only the "obligatory" contact information, but she also informed M.S. that the listed service providers had no waitlist. Bolduan repeatedly requested that M.S. complete the ROI form, which enables the Department to verify engagement in or completion of services. However, M.S. never returned the forms or otherwise indicated that she was engaged in the court-ordered service. Instead, M.S. contended that Dr. Tutty's recommendation was "invalid." Bolduan received no indication from M.S. that she willing to engage in the DBT program. Rather, M.S. told Bolduan that "she doesn't need it." In short, the record contradicts M.S.'s assertion of "delay" by the Department in offering DBT.

---

[14] The trial court found that the court-ordered services included those recommended by Dr. Tutty, Dr. Solchany, and Dr. Washington-Harvey. Thus, DBT became a court-ordered service in August 2019, when Dr. Tutty recommended it following his psychological evaluation of M.S. The parties do not dispute that DBT was a court-ordered service.

M.S. further contends that the Department did not "expressly and understandably offer or provide"[15] DBT because, according to M.S., the DBT programs identified by social worker Bolduan did not comply with the recommendations of Dr. Tutty and Dr. Solchany. Due to COVID-19 restrictions, the service providers identified by Bolduan were, at times, offering services only through telehealth. Dr. Tutty testified that his recommendation, which was made before COVID-19 restrictions were in place, was for an in-person DBT program, but he was aware that some service providers had pivoted to telehealth services. He noted that in-person services were still available until April or May 2020. Dr. Solchany testified that, to her knowledge, the programs at Sound Mental Health and Valley Cities did not offer DBT "as it was designed to be offered."

The recommendation set forth in the service letters, however, is simply for a "one-year [DBT] program." There is no indication in the record that, had M.S. engaged in a DBT program, the Department would not have accepted it as completion of her required service because, for instance, it was only available via telehealth. As Dr. Tutty testified, the Department does not typically confer with providers regarding whether particular services are sufficient to meet their recommendations.[16] Moreover, the record nowhere indicates that M.S. attempted to access the DBT programs repeatedly offered by the Department.

---

[15] Br. of Appellant at 57.

[16] Dr. Tutty was asked whether "the caseworker or anyone from the Department" spoke with him regarding any particular provider of DBT to determine whether the specific program offered was consistent with his recommendation. RP 468. He replied: "Typically after [performing an evaluation and making recommendations], I don't have contact with the—the social workers or caseworkers."

M.S.'s assertion that the services offered were inadequate is not supported by the record.

Contrary to M.S.'s assertion, there was no "delay" in offering services, nor were the services offered inconsistent with those recommended by service providers. Substantial evidence supports the juvenile court's finding that the court-ordered services, including DBT, were expressly and understandably offered or provided. M.S.'s assertion to the contrary is without merit.

V

M.S. next contends that the juvenile court impermissibly relied on extrinsic evidence and the judge's own testimony in terminating her parental rights and that her due process rights were thereby violated. We disagree. M.S. mischaracterizes the juvenile court's finding. Because the juvenile court neither relied on evidence not admitted during the proceedings nor personally testified during the proceeding, M.S.'s contention is unavailing.

Following the seven-day termination hearing, the juvenile court made findings regarding the credibility of the witnesses. The court found that the service providers, social worker Bolduan, and the CASA "were all credible and provided credible testimony." However, the court determined that M.S. was not credible, as "[m]uch of her testimony was contradicted by the testimony of credible witnesses." "Throughout [M.S.]'s testimony," the court explained, "she avoided questions, was unreasonably argumentative, and non-responsive."

The juvenile court also made a finding regarding M.S.'s disruptive behavior during the hearing. "[M.S.] was disruptive throughout the trial, and

caused the trial proceedings to be paused multiple times so that the Court could advise her to stop interrupting the proceedings. The Court has encountered disruptive parties in other proceedings, but [M.S.]'s behavior was exceptional in this regard." The court then listed the numerous ways in which M.S. had disrupted the proceedings. The court explained:

> By entering this Order, the Court is in no way penalizing [M.S.] for her trial conduct. Such conduct is, however, evidence that supports witness testimony regarding [M.S.]'s disruptive, unreasonable, and vexing conduct in other contexts, such as meetings with the children's educators, medical appointments, and visitation.[17]

The juvenile court's finding explains how the court considered conflicting testimony in determining credibility. For instance, the dependency order sets forth an incident in which M.S. "became belligerent" during a telephonic meeting with an official at W.W.S.'s school, then appeared on campus, "became aggressive with school staff," "snapped her fingers in the face" of the assistant principal, and then "sat on the floor and refused to leave." She was then removed from the campus by security. At the termination hearing, M.S. claimed that the incident "never happened." Social worker Bolduan testified, to the contrary, that M.S. was "unable to control her emotions" and thus could not participate in the school meeting. The juvenile court found that such testimony

---

[17] The juvenile court also noted M.S.'s behavior during the proceedings in Finding of Fact 2.34:

> [M.S.] made it difficult for Ms. Bolduan to have communications with her in any form. Emails that Ms. Bolduan would send would be met with long, rambling responses from [M.S.]. When Ms. Bolduan made attempts to speak by phone, [M.S.] would often times become unreasonably argumentative. The Court frequently observed this behavior during trial. [M.S.] frequently addressed the Court directly (often interrupting others) with lengthy, rambling statements and baseless, irrelevant arguments. During direct and cross examination, the mother would often provide answers that careened far off course and she would resist attempts to bring her back to the subject matter of the question.

was supported by M.S.'s behavior during the court hearing, which was similarly disruptive and unreasonable.

M.S. asserts, however, that the finding constitutes an improper consideration of extrinsic evidence. Nowhere, though, does M.S. cite to any published authority holding that a trial court judge may not make observations regarding the behavior of parties in the courtroom and rely on such observations in assessing credibility. Rather, the cases cited by M.S. are inapposite. See, e.g., Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 270, 796 P.2d 737 (1990) (challenging trial court's refusal to order new trial when juror allegedly engaged in misconduct by interjecting extrinsic evidence into deliberations); Breckenridge v. Valley Gen. Hosp., 150 Wn.2d 197, 199, 75 P.3d 944 (2003) (holding that it is jury misconduct for jurors to interject extrinsic evidence in jury deliberations). Extrinsic evidence is improper because it is "not subject to objection, cross-examination, explanation, or rebuttal." Breckenridge, 150 Wn.2d at 199 n.3. But an observation of disruptive behavior is not "evidence" to which such principles could apply. Cf. In re Welfare of Martin, 3 Wn. App. 405, 411-12, 476 P.2d 134 (1970) (judicial notice of testimony taken at prior dependency hearing would deprive parents of right of cross-examination of witnesses and precluded objections to hearsay or other incompetent evidence).

M.S. further asserts that the juvenile court's finding indicates that the judge "improperly testified about his observations and relied on his own

testimony as evidence."[18, 19] Evidence Rule 605 provides that "[t]he judge presiding at the trial may not testify in that trial as a witness." The rule may apply "even when the trial judge does not formally testify but inserts his or her own personal experience into the decision-making process." In re Estate of Hayes, 185 Wn. App. 567, 599, 342 P.3d 1161 (2015). However, judges are not expected to "leave their knowledge and understanding of the world behind and enter the courtroom with blank minds." State v. Grayson, 154 Wn.2d 333, 339, 111 P.3d 1183 (2005).

Thus, in Fernando v. Nieswandt, we held that the trial court judge did not impermissibly consider evidence outside the record in making "illustrative comments about his own experience on the bench and as a parent to explain his decision" in fashioning a parenting plan. 87 Wn. App. 103, 108-09, 940 P.2d 1380 (1997). Rather, the judge "was acting as a trier of fact and applying common sense to the facts of [the] dispute to make a decision." Nieswandt, 87 Wn. App. at 109. Similarly, here, the juvenile court judge relied on the judge's own experience and common sense in finding that M.S.'s disruptive behavior during the fact-finding hearing shed light on both the credibility of witnesses who testified consistent with those observations, as well as on M.S.'s credibility to the extent that she denied such behavior in other contexts.

---

[18] Again, the cases cited by M.S. are not applicable to the facts herein. See, e.g., United States v. Blanchard, 542 F.3d 1133 (7th Cir. 2008) (introduction of trial judge's suppression-hearing comments during trial were impermissible judicial testimony); Brown v. Lynaugh, 843 F.2d 849 (5th Cir. 1988) (defendant was denied a fair trial when the state was permitted to establish the essential elements of the crime through the testimony of the presiding trial judge); Tyler v. Swenson, 427 F.2d 412 (8th Cir. 1970) (trial judge in postconviction proceedings cannot properly serve as material witness as to what occurred in trial and also serve as trier of fact).

[19] Br. of Appellant at 66.

The juvenile court judge did not rely on extrinsic evidence or his own testimony in terminating M.S.'s parental rights. Accordingly, M.S.'s assertion that such conduct violated her due process rights fails.

VI

Finally, M.S. contends that the juvenile court improperly admitted hearsay evidence when the court permitted C.G.S.'s court-appointed special advocate to testify that C.G.S. is happy in his current home placement and would like to remain there. We have held, in similar contexts, that statutes authorizing the appointment of a guardian ad litem (GAL) provide for the court to receive the GAL's opinions and recommendations, including hearsay. Because the statute setting forth the duties of a GAL in dependency and termination proceedings similarly authorizes such testimony, the trial court did not err in admitting the CASA's testimony here.[20]

RCW 13.34.105 sets forth the duties of a GAL in dependency and termination proceedings. These duties include "[t]o meet with, interview, or observe the child, depending on the child's age and developmental status, *and report to the court any views or positions expressed by the child on issues pending before the court*." RCW 13.34.105(1)(b) (emphasis added). "GALs and volunteer CASAs are invaluable to courts. They are often the eyes and ears of the court and provide critical information about the child and the child's circumstances." In re Dependency of M.S.R., 174 Wn.2d 1, 21, 271 P.3d 234 (2012).

_____

[20] RCW 13.34.030(12) defines "guardian ad litem" to include a "court-appointed special advocate."

"A juvenile court 'has broad discretion in dependency and termination proceedings to receive and evaluate evidence in light of a child's best interest.'" In re Welfare of X.T., 174 Wn. App. 733, 738, 300 P.3d 824 (2013) (quoting In re Interest of J.F., 109 Wn. App. 718, 728, 37 P.3d 1227 (2001)). This discretion does not, however, permit the court to disregard evidentiary rules, "especially where the deprivation of parental rights is involved." X.T., 174 Wn. App. at 738 (holding that the trial court impermissibly admitted hearsay evidence in dependency proceeding where a social worker, the only witness, testified almost solely based on his review of the Department's file, and the trial court considered the testimony for the truth of the matter asserted). We review a trial court's decision to admit evidence for an abuse of discretion. In re Guardianship of Stamm, 121 Wn. App. 830, 835, 91 P.3d 126 (2004).

In Fernando, Division Two of this court rejected the argument that a GAL's testimony in a child custody case was an inadmissible opinion pursuant to ER 702.[21] 87 Wn. App. at 107-08. There, the applicable statute permitted the GAL "to interview doctors or experts who have seen the child in the past and report those impressions to the court." Fernando, 87 Wn. App. at 107. Notwithstanding that the GAL was not a "traditional expert under ER 702," the court held that "her recommendations are expressly admissible under RCW 26.12.175(1)(b)."[22]

---

[21] ER 702 provides:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[22] RCW 26.12.175(1)(b) provides, in pertinent part:
> The guardian ad litem's role is to investigate and report factual information regarding the issues ordered to be reported or investigated to the court. The guardian ad litem shall always represent the best interests of the child.

Fernando, 87 Wn. App. at 107. The court explained that "[t]he statutes which authorize the appointment of the guardian ad litem authorize the family courts to hear the opinions of a witness who would not be a traditional expert under ER 702." Fernando, 87 Wn. App. at 107. While the GAL is "not appointed as an 'expert,'" "she acts as a neutral advisor to the court and, in this sense, is an expert in the status and dynamics of that family who can offer a commonsense impression to the court." Fernando, 87 Wn. App. at 107.

We subsequently determined, in the context of a guardianship proceeding, that "the trial court may admit a GAL's testimony regarding her opinion and the basis for that opinion if the court finds the evidence likely to be helpful under ER 702." Stamm, 121 Wn. App. at 832. Relying on Fernando, we concluded that the guardianship statute "creates a category of nontraditional experts and provides for the court to receive their opinions and recommendations." Stamm, 121 Wn. App. at 837. Thus, we rejected the assertion that the GAL's testimony was inadmissible as hearsay:

> In performing his or her duties under the statute, a GAL is required to consult with those knowledgeable about the allegedly incapacitated person. The statute thus contemplates that hearsay will be a basis for the GAL's opinions. And in order to evaluate the GAL's opinions, the fact finder needs to know the basis for them.

Stamm, 121 Wn. App. at 837 (footnote omitted). The GAL's testimony may not, however, "be used as a vehicle to present and reiterate otherwise inadmissible

---

Guardians ad litem under this title may make recommendations based upon his or her investigation, which the court may consider and weigh in conjunction with the recommendations of all parties. If a child expresses a preference regarding the parenting plan, the guardian ad litem shall report the preferences to the court, together with the facts relative to whether any preferences are being expressed voluntarily and the degree of the child's understanding.

hearsay." Stamm, 121 Wn. App. at 838. "The permissible scope of a GAL's testimony is circumscribed by the parameters of the duties assigned by the statute." Stamm, 121 Wn. App. at 838.

During the fact-finding hearing, C.G.S.'s CASA was asked: "[A]re you aware of any expressed statements [C.G.S.] has made about issues that are pending before the Court?" M.S.'s attorney objected, asserting that the hearsay rules precluded the admission of such testimony. The CASA's attorney cited RCW 13.34.105, noting that the statute "requires the CASA to report to the Court any expressed statements by children that are on issues pending before the Court." The juvenile court overruled the objection. The CASA then testified that C.G.S. "has indicated that he is happy where he is in his current placement, and that's where he wants to stay." On appeal, M.S. challenges the admission of this evidence as impermissible hearsay.

This contention is at odds with the court's decisions in Fernando and Stamm, cases that M.S. does not address. As in guardianship and child custody cases, the role of the GAL in dependency and termination proceedings is to investigate and report to the court "in circumstances where family dynamics make a neutral assessment particularly important." Stamm, 121 Wn. App. at 837; see RCW 13.34.105(1). Indeed, the role of the GAL in child custody proceedings and dependency and termination proceedings is remarkably similar. See RCW 13.34.105(1)(b) (requiring that GAL in dependency and termination proceedings "report to the court any views or positions expressed by the child on issues pending before the court"); RCW 26.12.175(1)(b) (in child custody

26

proceedings, providing that "[i]f a child expresses a preference regarding the parenting plan, the guardian ad litem shall report the preferences to the court"). Both "comtemplate[] that hearsay will be a basis for the GAL's opinions." Stamm, 121 Wn. App. at 837.

The scope of the CASA's testimony here is squarely within the parameters of the duties assigned by the statute. See Stamm, 121 Wn. App. at 838. RCW 13.34.105(1)(b) requires that a GAL "report to the court any views or positions expressed by the child on issues pending before the court," and the CASA here did precisely that in informing the court of C.G.S.'s desire to remain in his current placement. The CASA's opinion was based, in part, on his conversations with C.G.S., including those in which C.G.S. expressed a preference regarding his living situation. Accordingly, the juvenile court had discretion to admit this testimony, "including hearsay," pursuant to ER 702.[23] Stamm, 121 Wn. App. at 837. The juvenile court did not err in admitting the CASA's testimony.[24]

---

[23] More to the point, we doubt that there is any merit to M.S.'s contention even if the CASA's testimony had been admitted for the truth of the matter asserted. The legislature has mandated that a GAL or CASA must report to the court the views of the child on matters pending before it. RCW 13.34.105(1)(b). Clearly, the legislature has done so for the purpose of affecting the juvenile court's decision making. That the legislature may enact a statutory exception to the hearsay rule is not a novel proposition. See, e.g., ER 803(a)(6) ("*Records of Regularly Conducted Activity.* [Reserved. See RCW 5.45.]"); ER 803(a)(8) ("*Public Records and Reports.* [Reserved. See RCW 5.44.040.]"). Our rules must be construed to give effect to such legislative mandates.

[24] M.S. asserts that she was denied a fair hearing due to cumulative error. Because we find no error in the juvenile court's order, we reject this contention. M.S. further assigns error to 57 of the juvenile court's 68 findings of fact. After a review of the record, we determine that sufficient evidence supports the trial court's findings.

In addition, M.S. requests that we strike the brief submitted by C.G.S.'s CASA. A GAL or CASA in dependency or termination proceedings is "treated as a party, but only for certain purposes and only in superior court." In re Dependency of D.L.B., 186 Wn.2d 103, 106 n.1, 376 P.3d 1099 (2016) (citing GALR 2(j), 4(h)). We have discretion, however, to consider briefs from nonparties. RAP 10.1(e), (h). Exercising that discretion, we both deny the motion to strike and decline to impose sanctions on any participant.

Affirmed.

WE CONCUR: